UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BUILDING INDUSTRY ASSOCIATION
OF THE BAY AREA, et al.,

    Plaintiff(s),

  v.

UNITED STATES DEPARTMENT
OF COMMERCE, et al.,

    Defendant(s).
_____/

No. C 11-4118 PJH

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs' and defendants' motions for summary judgment came on for hearing before the court on September 12, 2012. Plaintiff Building Industry Association of the Bay Area and Bay Planning Coalition ("plaintiffs") appeared through their counsel, Theodore Hadzi-Antich. Defendants Department of Commerce, National Oceanic and Atmospheric Administration, U.S. National Marine Fisheries Service, John Bryson, and Eric C. Schwaab ("defendants" or "federal defendants") appeared through their counsel, Kristen Floom. Defendant-intervenor Center for Biological Diversity ("defendant-intervenor") appeared through its counsel, Emily Jeffers. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby GRANTS defendants' and defendant-intervenor's motions for summary judgment, and DENIES plaintiffs' motion for summary judgment as follows.

**BACKGROUND**

This is a case about environmental regulations and the designation of the "critical habitat" for a threatened species, namely, the green sturgeon. The facts of the case are largely undisputed. The Endangered Species Act ("ESA") provides for the protection of species that are either "endangered" (in danger of becoming extinct) or "threatened" (likely

to become endangered in the foreseeable future). If a species meets either of those criteria, it is "listed" as either threatened or endangered. Once a species is listed, the government has the authority to designate certain areas as "critical habitat" that are necessary to the conservation of the species, and which may require special protection. The Departments of Commerce and the Interior are responsible for these decisions, and have delegated those responsibilities (in the context of certain species, including the green sturgeon) to the National Marine Fisheries Service ("NMFS").

The green sturgeon was listed as a threatened species, which enabled NMFS to determine which areas, if any, were to be designated as "critical habitat," and thus deserving of special protection. Section 4(b)(2) of the ESA sets forth the procedure by which "critical habitat" areas are designated:

> The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

16 U.S.C. § 1533(b)(2).

As the text of section 4(b)(2) shows, the ESA is designed not only to protect the habitats of certain species, but also to achieve that protection without creating unnecessary economic impact. Congress delegated to the Secretary of Commerce (who then delegated to the NMFS) both the power to "designate" critical habitats for the green sturgeon, and to "exclude" those areas from designation based on economic impact, national security impact, or any other relevant impact.

NMFS endeavored to perform this "critical habitat" designation for the green sturgeon, and performed various analyses of the species, the physical and biological areas necessary to conservation of the species, the economic interests that would be impacted by conservation, and ultimately, the conservation value of each specific area. NMFS

looked at each area that it was considering designating as a "critical habitat," and assigned each area a conservation value rating of "high," "medium," or "low." NMFS also was aware of section 4(b)(2)'s language regarding exclusion of those areas where designation would have a large economic impact, and thus analyzed the economic impact of designating each area. NMFS ultimately decided that all areas found to have a "high" conservation value rating would not be eligible for exclusion; in other words, they would all be designated as critical habitat. NMFS issued a "final rule" codifying this decision, and this final rule gave rise to this litigation.

Plaintiffs Building Industry Association of the Bay Area ("BIABA") and Bay Planning Coalition ("BPC") both represent property owners impacted by NMFS' decision to designate certain lands as "critical habitat." Specifically, BIABA is a "nonprofit association of builders, contractors, and related trades and professions involved in the residential construction industry," and BPC is a nonprofit organization representing the interests of "business and property owners in the San Francisco Bay Area" whose "mission is to ensure a healthy and thriving San Francisco Bay Area for commerce, recreation, and the natural environment." See Complaint, Dkt. 1 at ¶¶ 6-7. Plaintiffs filed suit against defendants Department of Commerce (and John Bryson[1] in his official capacity as Secretary of the Department of Commerce), NMFS (and Eric C. Schwaab in his official capacity as assistant administrator for NMFS), and the National Oceanic and Atmospheric Administration, asserting three causes of action: (1) failure to take into consideration economic impacts in high conservation value ("HCV") areas under ESA section 4(b)(2); (2) failure to balance the benefits in HCV areas under ESA section (4)(b)(2); and (3) violations of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). NEPA requires federal agencies to examine the environmental effects of proposed federal actions and to inform the public of the environmental concerns that went into the agency's decision

---

[1] Plaintiff's complaint originally named as a defendant Gary Locke, in his official capacity as Secretary for the United States Department of Commerce, but defendants have substituted John Bryson pursuant to Fed. R. Civ. P. 25(d).

making, and requires the government to prepare environmental impact statements to that effect. The APA provides a right of judicial review to a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," if agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Plaintiffs filed this action against the federal defendants on March 10, 2011, in the U.S. District Court for the District of Columbia. On April 13, 2011, the Center for Biological Diversity ("CBD") filed a motion to intervene, which was granted. On August 1, 2011, the case was transferred to the Northern District of California. Plaintiffs moved for summary judgment on all three of their claims on April 13, 2012, and the federal defendants and the defendant-intervenor filed cross-motions for summary judgment.

## DISCUSSION

A.  Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v.Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its

initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e). But allegedly disputed facts must be material – the existence of only "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011). In adjudicating cross-motions for summary judgment, the Ninth Circuit "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." ACLU of Nevada v. City of Las Vegas, 466 F.3d 784, 790-91 (9th Cir. 2006) (citations omitted).

B.  Legal Analysis

Plaintiffs' first and second causes of action both arise under section 4(b)(2) of the ESA, and both are premised on the argument that defendants' blanket designation of all high conservation value areas, without any balancing of economic interests, constituted a violation of defendants' duties under the ESA. Even though plaintiffs' first and second causes of action are based on the same legal theory, each uses a different statutory hook from the text of the ESA. The first cause of action is based on defendants' alleged "failure to take into consideration economic impacts in high conservation value areas." See Dkt. 1 at 11. The second cause of action is based on defendants' alleged "failure to balance the

benefits in HCV areas." Id. For reference, section 4(b)(2) of the ESA is as follows, with relevant portions underlined:

> The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and <u>after taking into consideration the economic impact</u>, the impact on national security, and any other relevant impact, <u>of specifying any particular area as critical habitat</u>. The Secretary <u>may exclude</u> any area from critical habitat if he determines that <u>the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat</u>, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

Plaintiffs argue that the first sentence of section 4(b)(2) - specifically, the words "shall designate . . . after taking into consideration the economic impact" - creates a nondiscretionary duty to account for economic impact in all areas, even HCV areas, when making a decision to designate critical habitat. In plaintiffs' words, "[n]o area, now matter how it may be classified by NMFS, is excepted from the requirement to consider economic impacts." Pls.' Mot. Summ. J., Dkt. 45 at 11.

Plaintiffs then point to the second sentence as setting forth the methodology for such a "consideration." Plaintiffs argue that the word "outweigh" serves to "direct the government to conduct the assessment of economic impacts specifically by a balancing-of-the-benefits methodology." See Dkt. 45 at 11. In plaintiffs' view, the "second sentence of Section 4(b)(2) prescribes the manner in which the duty to consider economic impacts mandated in the first sentence must be performed." Id. at 14. Plaintiffs do concede that "the ultimate decision whether to exclude any area from critical habitat is discretionary," but they emphasize that "the requirement to consider economic impacts by means of balancing the benefits is mandatory." Id. at 11.

For their part, defendants do concede that they had a mandatory duty to "consider" the economic impacts of designating an area as critical habitat. However, they take issue with plaintiffs' interpretation of section 4(b)(2)'s second sentence as imposing a "mandatory" balancing test. They argue that "[t]here is no statutory requirement that NMFS balance the benefits of designation of critical habitat against the benefits of exclusion," and

that NMFS "was not required to use any particular methodology" to "consider" the economic impact of designation. Defs.' Cross-Mot. Summ. J., Dkt. 50 at 10-11. Instead, defendants characterize section 4(b)(2) as having two components: (1) an initial, mandatory requirement to consider economic (and other) impacts, and (2) a "wholly discretionary process" by which the agency can exclude certain areas from designation. Id. at 11. And as defendant-intervenor adds, the ESA "does not dictate the manner in which NMFS performs the analysis," and "[h]ad Congress intended NMFS [] to conduct critical habitat designations using a balancing-of-the-benefits methodology, it would have explicitly so required." Def.-Int.'s Mot. Summ. J., Dkt. 51 at 7, 8-9.

As evidence of NMFS' consideration, the federal defendants point to an economic analysis report prepared by an outside consultant, Industrial Economics, Inc. (the "Indecon report"). See Dkt. 48, Ex. 22. According to defendants, the Indecon report "considered 14 potentially affected economic activities, calculated a total economic impact score for each critical habitat unit, and characterized the associated economic costs for each unit as high, medium, or low." Dkt. 50 at 14. After reviewing the Indecon report, NMFS prepared a report of its own, titled the "Final ESA Section 4(b)(2) Report." See Dkt. 48, Ex. 21. Defendant-intervenor argues that the section 4(b)(2) report shows that NMFS actually did balance the benefits of conservation with the economic impact, even though it was not obligated to do so. Specifically, defendant-intervenor points to the report's use of specific dollar thresholds to represent the economic impact of designating each particular area as critical habitat. Even though NMFS ultimately concluded that no HCV areas would be excluded from designation, defendant-intervenor argues that this "does not mean NMFS did not weigh the benefits of exclusion against those of designation," but instead shows only that NMFS "determined that because HCV areas were critical to the recovery of the green sturgeon, those areas would not be eligible for exclusion even when economic costs were high." Def.-Int.'s Reply, Dkt. 55 at 7-8.

The parties thus present two issues for the court to decide:

(1) What is the scope of NMFS' duty under section 4(b)(2) of the ESA? Was it obligated only to "consider" the economic impact of designation, or both to "consider" the economic impact and to balance that impact with the environmental effects of designation?

(2) Whatever the scope of the duty, did NMFS comply with it?

Regarding the first issue, the court finds that the text of section 4(b)(2) is clear in requiring NMFS to "consider" the economic impact of designation. See Bennett v. Spear, 520 U.S. 154, 172 (1997) ("the fact that the Secretary's ultimate decision is reviewable only for abuse of discretion does not alter the categorical requirement that, in arriving at his decision, he 'tak[e] into consideration the economic impact, and any other relevant impact.'") (emphasis in original). However, the statutory text does not specify any particular methodology that must be used to accomplish this "consideration." Thus, the court rejects plaintiffs' argument that defendants were obligated to perform a balancing test. In fact, the second sentence of section 4(b)(2) shows that the entire "exclusion" process itself is discretionary. A simple reordering of the sentence (without changing the meaning) makes this clearer: "If the Secretary determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, he may exclude any area from critical habitat." Based on the plain text of the statute, even if the secretary does determine that the benefits of exclusion outweigh the benefits of designation, he is still not obligated to exclude that area from designation. Instead, he "may exclude" the area from designation. Accordingly, even if NMFS was somehow obligated to perform a balancing test, it was not obligated to exclude any area from designation regardless of the results of that balancing test.

Thus, the key question is whether NMFS did indeed "tak[e] into consideration the economic impact" of designation before issuing its final rule. The court finds that the administrative record, especially NMFS' "Final ESA Section 4(b)(2) Report," shows that NMFS did satisfy its duty to consider economic impacts. The section 4(b)(2) report makes clear each step of the NMFS' analysis. After identifying the specific areas to be analyzed,

the report "determine[s] the benefits of designation," and then "determine[s] the benefits of exclusion." Dkt. 48, Ex. 21 at 15-18. In the section describing the economic benefits of exclusion, NMFS notes that it was "able to monetize estimates of the economic impacts resulting from a critical habitat designation," and that "[s]everal factors were considered in developing the economic impacts, including the level of economic activity within each area, the level of baseline protection afforded to green sturgeon by existing regulations for each economic activity within each area, and the estimated economic impact (in dollars) associated with each activity type." Id. at 17. After describing the benefits of both designation and exclusion, the report then sets forth NMFS' "exclusions based on economic impacts." Id. at 18. This section specifically states that "to weigh the benefits of designation against the benefits of exclusion, we compared the conservation value ratings with the range of high to low annualized economic cost estimates," and includes a chart showing this comparison. Id. at 18, 27. NMFS "selected dollar thresholds representing the levels at which the potential economic impact associated with a specific area appeared to outweigh the potential conservation benefits of designating that area." Id. at 18. To determine those thresholds, NMFS "examined the range in economic impacts across all areas within a conservation value rating category, determined where the breakpoint occurred between relatively low economic impacts and relatively high economic impacts, and selected a value within the range of that breakpoint where economic impacts may outweigh the conservation benefits for that area." Id. After determining this dollar "threshold" for all areas, including HCV areas, "four decision rules were established based on these dollar thresholds." Id. While plaintiffs obviously disagree with NMFS' rule that "all areas with a conservation value rating of 'High' were not eligible for exclusion regardless of the level of economic impact because of the threatened status of the green sturgeon," the record shows that NMFS did properly consider the economic impacts before deciding that HCV areas would be ineligible for exclusion, and thus satisfied its duty under section 4(b)(2) of the ESA. In fact, the mere presence of these economic analyses in the record would be enough to establish that NMFS satisfied its duty, because in this circuit, an

9

agency is entitled to a presumption that it considered all relevant information "unless rebutted by evidence in the record." Rock Creek Alliance v. U.S. Fish & Wildlife Service, 663 F.3d 439, 443 (9th Cir. 2011); see also Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1081 (9th Cir. 2006). Even if the court accepted plaintiffs' reading of the statute and required NMFS to perform the "balancing" test urged by plaintiffs, it appears that defendants cleared that higher bar. Regardless, the court holds only that defendants were required to, and did, "consider" economic impacts, and makes no determination as to the exact methodology required for such consideration.

As to the ultimate designation decision reached by NMFS, the court notes that the Administrative Procedures Act does not allow for court review of an agency's action if "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). An agency action is committed to agency discretion by law if the underlying "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985). In this case, section 4(b)(2) of the ESA does not provide any standard by which to judge an agency's decision not to exclude an area from critical habitat designation. As explained above, the second sentence of section 4(b)(2) establishes a discretionary process by which the secretary may exclude areas from designation, but does not set forth any standard governing when a certain area must be excluded from designation. Put another way, section 4(b)(2) provides a standard of review to judge decisions to exclude, but provides no such standard to review decisions not to exclude. Thus, the agency action in this case is committed to agency discretion by law, and the APA precludes court review of NMFS' ultimate decision. See also Cape Hatteras Access Preservation Alliance v. U.S. Dept. of the Interior, 731 F.Supp.2d 15, 29 (D.D.C. 2010) ("The plain reading of the statute fails to provide a standard by which to judge the Service's decision not to exclude an area from critical habitat."); Home Builders Ass'n of Northern California v. U.S. Fish & Wildlife Service, 2006 WL 3190518 (E.D. Cal. 2006) ("[T]he court has no substantive standards by which to review the [agency's]

decisions not to exclude certain tracts based on economic or other considerations, and those decisions are therefore committed to agency discretion.").

Finally, plaintiffs' third cause of action is based on the allegation that defendants' failure to prepare either an environment assessment or an environmental impact statement, as required by NEPA, constitutes a violation of the APA. However, plaintiffs concede that the Ninth Circuit has held that "NEPA does not apply to critical habitat designations," and that plaintiffs are merely "preserving their NEPA claim for appeal." Pls.' Reply, Dkt. 52 at 20 (citing Douglas County v. Babbitt, 48 F.3d 1495 (9th Cir. 1995)); Dkt. 45 at 21. On that basis alone, summary judgment in favor of defendants is justified.

However, even if the Ninth Circuit were to accept plaintiffs' invitation to "revisit" Babbitt, plaintiffs would still lack standing to bring a NEPA claim. To assert a NEPA claim, "a plaintiff must allege injury to the environment; economic injury will not suffice." Ranchers Cattlemen Action Legal Fund v. U.S. Dept. of Agriculture, 415 F.3d 1078, 1103 (9th Cir. 2005). As alleged in the complaint, plaintiffs are property owners, business owners, and developers who would be forced to "incur costs by taking specific measures to ensure that the use and development of their properties located within the designated habitat areas does not run afoul of [ESA] prohibitions." Dkt. 1 at ¶¶ 6-7. These injuries appear to be purely economic. However, after defendants and defendant-intervenor raised the standing issue in their motions, plaintiffs attempted to articulate an environmental injury by claiming that the critical habitat designation "interferes with their ability not only to achieve economic goals, but also to preserve and maintain for their members a physical environment that can support and sustain those economic goals by securing important environmental values such as aesthetics, water access, and shoreline access." Dkt. 52 at 17. Plaintiff BPC further claims that one of its "explicit mission[s]" is to "ensure there is sufficient geographic territory available for its members on which they may develop and engage in commerce, while preserving the environment." Id. at 18 (emphasis added by plaintiffs). Even as stated by plaintiffs, any alleged injury is purely economic. While plaintiffs may have the "mission" of engaging in commerce in a way that minimizes damage to the environment, that is not

the same as alleging that the environment itself would be harmed as a result of ESA designations, which is the proper test for NEPA standing. <u>Ranchers Cattlemen</u>, 415 F.3d at 1103; <u>see also</u> <u>Cal. Forestry Ass'n v. Thomas</u>, 936 F.Supp. 13, 22 (D.D.C. 1996) (finding no standing where the environmental injury alleged by plaintiffs was "in fact no more than an economic injury in disguise.") (internal citation omitted).

Accordingly, the court GRANTS summary judgment in favor of the federal defendants and the defendant-intervenor on all three of plaintiffs' causes of action. Plaintiffs' motion for summary judgment is DENIED. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: November 30, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge